1

2

3

4

5                       UNITED STATES DISTRICT COURT

6                     NORTHERN DISTRICT OF CALIFORNIA

7

8    ISAIAH THOMPSON-BONILLA,                    No. C 05-1350 SI (pr)

9                  Petitioner,                   **ORDER DENYING HABEAS
                                                 PETITION**
10         v.

11   JOHN MARSHALL,

12                  Respondent.
     _____/
13

14                              **INTRODUCTION**

15         This matter is now before the court for consideration of the merits of Isaiah Thompson-

16   Bonilla's pro se petition for writ of habeas corpus.  For the reasons discussed below, the petition

17   will be denied.

18

19                              **BACKGROUND**

20   A.    The Crimes

21         Thompson-Bonilla's petition pertains to his conviction for three robberies and one

22   attempted robbery.  The particulars of the crimes are not relevant to the claims in the habeas

23   petition, and therefore are only briefly summarized.

24         Thompson-Bonilla robbed Sabina Crocette at gunpoint as she walked home from the

25   West Oakland BART station at about 9:25 p.m. on January 8, 2001.  He threatened her with his

26   gun, took her money, left her wallet on the ground, and departed on foot.  He obtained about $70

27   in this robbery.   She could not find her credit card holder and credit cards after the robbery.

28         He robbed Regina Bell at gunpoint as she walked home from the same BART station at

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

about 11:45 p.m. on January 10, 2001.  He threatened her with his gun and took her money.  At her request, left the wallet with an identification she needed to register for school.  He obtained about $30 in this robbery.

At about 1:00 p.m. on January 14, 2001, Thompson-Bonilla attempted to rob James Roth on the street near the West Oakland BART station.  He threatened Roth with his gun which was partially concealed in a paper bag.  Roth told him he did not have any money because he had just purchased groceries.  Roth walked away, and called the police from his home.

A few minutes after the failed attempt to rob James Roth, Thompson-Bonilla robbed Maria Cahill in the same area.  He pointed a gun which was partially concealed in a bag at her and threatened her, telling her that he needed money for drugs.  Cahill told him she only had $10, retrieved that amount from her change purse, and handed it to Thompson-Bonilla.  He then grabbed her change purse and obtained about $3 in coins. He gave the coin purse back to Cahill and walked away.  Cahill went home, where her husband called the police.

Thompson-Bonilla was arrested minutes after the Cahill robbery.  He "matched the suspect description of an African-American male in his 40's, wearing a green jacket, white pants, and black hat. The police spotted [him] five blocks from the Cahill robbery site, walking down the street counting change.  The police stopped and pat-searched [Thompson-Bonilla], and found that he had a brown paper bag containing a gun.  The gun was not loaded.  The police conducted a full search and recovered a $10 bill and $2.70 in coins." Cal. Ct. App. Opinion, pp. 4-5.

After his arrest, Thompson-Bonilla made some incriminating statements at the scene and later confessed.  He was identified by two victims in field show-ups and identified by two other victims in a lineup at the police station.  The details of those are described later in the sections discussing claims arising from his statements and witness identifications.

B.    Case History

Thompson-Bonilla was convicted following a bench trial in Alameda County Superior Court of three counts of robbery and one count of attempted robbery (all committed with personal use of a firearm), and one count of being a felon in possession of a firearm.  See Cal.

United States District Court
For the Northern District of California

1   Penal Code, §§ 211, 664, 12021(a)(1). 12022.53(b).  He was found to have suffered three prior

2   robbery convictions that counted as strikes under California's Three Strikes law.  See Cal. Penal

3   Code § 1170.12(c)(2)(A).  Thompson-Bonilla was sentenced to a total term of 45 years to life,

4   comprised of 25-to-life on one count of robbery, enhanced 10 years for the firearm use, plus 5

5   years for each of the two prior convictions.

6       He appealed.  His conviction was affirmed by the California Court of Appeal and his

7   petition for review was denied by the California Supreme Court.  He also filed an unsuccessful

8   state habeas petition, during the pendency of which this action was stayed.

9       In his second amended petition in this court, Thompson-Bonilla asserted seven claims for

10  relief.  Respondent filed his answer and supplemental answer.   Thompson-Bonilla filed a

11  traverse.  The matter is now ready for decision on the merits.

12

13                          **JURISDICTION AND VENUE**

14      This court has subject matter jurisdiction over this habeas action for relief under 28

15  U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged

16  conviction occurred in Alameda County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

17

18                                **EXHAUSTION**

19      Prisoners in state custody who wish to challenge collaterally in federal habeas

20  proceedings either the fact or length of their confinement are required first to exhaust state

21  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

22  highest state court available with a fair opportunity to rule on the merits of each and every claim

23  they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that

24  state court remedies were exhausted for the claims in the second amended petition.

25

26                            **STANDARD OF REVIEW**

27      This court may entertain a petition for writ of habeas corpus "in behalf of a person in

28  custody pursuant to the judgment of a State court only on the ground that he is in custody in

3

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

**DISCUSSION**

A.     Challenge To 1990 Conviction Used For Enhancement Purposes

Thompson-Bonilla contends that his right to due process was violated by the trial court's refusal to strike the 1990 prior conviction. That conviction was used for purposes of enhancing his current sentence as a recidivist under California's Three Strikes law. He contends that the 1990 prior conviction should be vacated because he was not adequately advised of his constitutional rights before he pled guilty in that case.

It is too late for Thompson-Bonilla to challenge the 1990 conviction. "[O]nce a state

United States District Court
For the Northern District of California

1    conviction is no longer open to direct or collateral attack in its own right because the defendant

2    failed to pursue those remedies while they were available (or because the defendant did so

3    unsuccessfully), the conviction may be regarded as conclusively valid. . . . If that conviction is

4    later used to enhance a criminal sentence, the defendant generally may not challenge the

5    enhanced sentence through a petition under § 2254 on the ground that the prior conviction was

6    unconstitutionally obtained." Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 403-04

7    (2001).  Thompson-Bonilla may no longer challenge his 1990 conviction.  The sentence on the

8    1990 conviction was finished and the conviction was no longer open to direct or collateral

9    challenge long before his 2001 conviction occurred.  See RT 1184 (received probation in 1990).

10        The only exception to the rule barring challenges to prior convictions used to enhance

11    current sentences is that a petitioner may challenge a prior conviction on the ground that there

12    was a failure to appoint counsel in that case in violation of the Sixth Amendment.  Coss at 404.

13    Thompson-Bonilla was not denied counsel in the 1990 proceedings, and therefore does not fit

14    within the narrow exception to non-reviewability established by Coss.  See RT 1185 (Thompson-

15    Bonilla testifying that he consulted with his counsel before entering plea).  Coss therefore

16    precludes consideration of his claim in a federal habeas proceeding.

17

18    B.    Eighth Amendment Challenge To Sentence

19        Thompson-Bonilla contends that his sentence of 45 years to life imprisonment violated

20    his Eighth Amendment right to be free from cruel and unusual punishment.  He urges that the

21    court should note certain circumstances of the offenses committed: the gun was not loaded, the

22    encounters were brief, no physical force was used, no one was injured, the property loss was

23    minimal, the robberies were done to feed a drug addiction.  He also argues that he showed

24    empathy towards his victims by, for example, leaving a wallet behind in one case and allowing

25    Roth to depart unhindered when Roth said he had no money.  He also states that the court should

26    consider the nature of the offender – arguing that he was a productive member of the community

27    before drugs ruined his life and predicting that he could once again become one.

28

5

**United States District Court**
For the Northern District of California

A criminal sentence that is significantly disproportionate to the crime for which the defendant was convicted violates the Eighth Amendment's prohibition of cruel and unusual punishment.  See Solem v. Helm, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment).  "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare."  Id. at 289-90 (citation and quotation marks omitted).  "'The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).  Under this proportionality principle, the threshold determination for the court is whether petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.  Harmelin, 501 U.S. at 1005; Ewing, 539 U.S. at 30-31 (applying Harmelin standard).  Only if such an inference arises does the court proceed to compare petitioner's sentence with sentences in the same and other jurisdictions.  See Harmelin, 501 U.S. at 1005; cf. Ewing, 538 U.S. at 23.  The threshold for an "inference of gross disproportionality" is quite high.  See, e.g., Ewing, 538 U.S. at 30 (sentence of 25 years to life for conviction of grand theft with prior convictions was not grossly disproportionate); Lockyer v. Andrade, 538 U.S. 63 (2003) (upholding two consecutive 25-to-life terms for two convictions of theft of videotapes with prior convictions); Harmelin, 501 U.S. at 1008-09 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality).  Andrade and Ewing are the Supreme Court's most recent pronouncements on Eighth Amendment claims regarding prison sentences and both upheld California Three Strikes sentences for shoplifters with prior convictions.  One of the important lessons from these two cases is that relief under the Eighth Amendment continues to be reserved for the extreme cases.

In determining whether the sentence is grossly disproportionate under a recidivist

sentencing statute, the court looks to whether such an "extreme sentence is justified by the gravity of [an individual's] most recent offense and criminal history." Ramirez v. Castro, 365 F.3d 755, 768 (9th Cir. 2004); see Ewing, 538 U.S. at 28.  In judging the appropriateness of a sentence under a recidivist statute, a court may take into account the government's interest not only in punishing the offense of conviction, but also its interest "'in dealing in a harsher manner with those who [are] repeat[] criminal[s].'" United States v. Bland, 961 F.2d 123, 129 (9th Cir.) (quoting Rummel v. Estelle, 445 U.S. 263, 276 (1980)), cert. denied, 506 U.S. 858 (1992).  The Eighth Amendment does not preclude a state from making a judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one serious or violent crime, as may occur in a sentencing scheme that imposes longer terms on recidivists. See, e.g., Ewing, 538 U.S. at 25 (upholding 25-to-life sentence for recidivist whose current conviction was for grand theft (for shoplifting three golf clubs)); Rummel, 445 U.S. at 284-85 (upholding life sentence with possibility of parole for recidivist convicted of fraudulent use of credit card for $80, passing forged check for $28.36 and obtaining $120.75 under false pretenses; Nunes v. Ramirez-Palmer, 485 F.3d 432, 439 (9th Cir.), cert. denied, 128 S. Ct. 404 (2007) (upholding 25-to-life sentence for current conviction of petty theft with a prior theft-related conviction after finding that the petitioner's criminal history was longer, more prolific, and more violent than that in Andrade where a stiffer sentence was upheld); Taylor v. Lewis, 460 F.3d 1093, 1101-02 (9th Cir. 2006) (upholding 25-to-life sentence upon a conviction of possession of 0.036 grams of cocaine base with two prior felony convictions for voluntary manslaughter and robbery, and past violations of probation and parole); Rios v. Garcia, 390 F.3d 1082, 1082-83 (9th Cir. 2004), cert. denied, 546 U.S. 827 (2005) (upholding 25-to-life sentence for current conviction of petty theft with a prior theft-related conviction and second degree burglary (for episode in which he shoplifted two watches having a combined value of $79.88, was chased by a loss prevention officer and was apprehended in the store parking lot after a minor struggle) and prior convictions were two robbery convictions in 1987); Bland, 961 F.2d at 128-29 (upholding life sentence without the possibility of parole for being a felon in

1    possession of a firearm with thirteen prior violent felony convictions, including rape and

2    assault); but see, e.g., Ramirez, 365 F.3d 755 (25-to-life sentence was grossly disproportionate

3    for offender whose current crime was petty theft with a prior theft-related conviction and the two

4    prior strike convictions were robbery convictions); Reyes v. Brown, 399 F.3d 964 (9th Cir.

5    2005), cert. denied, 547 U.S. 1218 (2006) (remanding for further proceedings to determine

6    whether 26-to-life sentence was grossly disproportionate for current offense of perjury (for

7    making misrepresentations on a DMV driver's license application when he impersonated a

8    friend) and prior convictions were a 1981 residential burglary conviction committed as a juvenile

9    and a 1987 armed robbery conviction).

10         The standard of review in § 2254(d) presents an additional problem for habeas petitioners

11   asserting Eighth Amendment sentencing claims.  In Lockyer v. Andrade, 538 U.S. at 72-73, the

12   Court rejected the notion that its case law was clear or consistent enough to be clearly

13   established federal law within the meaning of 28 U.S.C. § 2254(d), except that it was clearly

14   established that a gross disproportionality principle did apply to sentences for terms of years (as

15   well as to the death penalty).  However, the precise contours of that principle "are unclear,

16   applicable only in the 'exceedingly rare' and 'extreme' case."  Id. at 73 (quoting Harmelin, 501

17   U.S. at 1001).

18         The California Court of Appeal rejected Thompson-Bonilla's Eighth Amendment

19   challenge to his sentence.  The court correctly identified the controlling gross disproportionality

20   rule,  see Cal. Ct. App. Opinion, p. 8 (citing Ewing), and reasonably applied it.  Thompson-

21   Bonilla had "a long history of recidivism, beginning with petty theft in 1989 and continuing

22   through the next decade and beyond with multiple robberies and drug offenses. [He] did not

23   reform himself despite lenient grants of probation, parole, and drug diversion.  Instead, [he]

24   continued to rob people with threats of violence. [Thompson-Bonilla's] prison sentence is not

25   cruel and unusual punishment for his current offenses and history of recidivism."  Id. at 8-9.

26         Thompson-Bonilla is not entitled to habeas relief on his Eighth Amendment claim.  His

27   is not that rare case where the sentence can be said to be grossly disproportionate.  An armed

28

**United States District Court**
For the Northern District of California

robbery is considered extremely serious crimes, and certainly is far more serious than the shoplifting crimes at issue in <u>Andrade</u> and <u>Ewing</u>, in which the Supreme Court upheld 25-to-life and 50-to-life sentences for recidivist offenders.  Even if it is proper to account the various circumstances that Thompson-Bonilla suggests should lessen his culpability, his conduct still amounted to an armed robbery (and attempted armed robbery) even if each was not the worst instance of that crime that ever occurred.  In each robbery, he displayed the gun and indicated he was going to use it on the victim; although he now wants the court to consider that the gun was unloaded, he never told the victims that fact and at least one victim thought he was going to kill her when he threatened her with the gun.  In each robbery, he took all the cash that the victim had, and his minimal monetary gain was not due to some kindness on his part but simply reflected he robbed from people who had no more cash for him to take.  These may have been relatively minor crimes from his perspective but the victims almost certainly considered them to be much more serious.  In any event, regardless of all the circumstances Thompson-Bonilla has identified to try to minimize the seriousness of the crimes, these armed robberies were more serious than the current crimes in every Supreme Court and Ninth Circuit case cited in this section of the order.  Also, his criminal history was more serious than those in <u>Andrade</u> and <u>Ewing</u> and most of the cited Ninth Circuit cases.  <u>See</u> Probation Officer's Report, unnumbered pages following CT 874.

The fact that he committed the robberies to feed a drug addiction does not help him.  Even if his drug addiction was proven and was considered a mitigating factor, it would be constitutionally irrelevant.  The Supreme Court has not held that a court must consider mitigating factors in determining whether a prison sentence is constitutionally permissible.  Indeed, Supreme Court sentiment seems to be to the contrary.  A majority of the <u>Harmelin</u> court rejected the contention that the Eighth Amendment requires a judge to consider mitigating factors before sentencing a convicted criminal to life imprisonment without the possibility of parole, thereby declining to extend the "individualized capital-sentencing doctrine" to non-capital cases.  <u>See Harmelin v. Michigan</u>, 501 U.S. at 994-996; <u>United States v. Gomez</u>, 472

United States District Court
For the Northern District of California

F.3d 671, 674 (9th Cir. 2006) (Harmelin does not apply to challenge to non-capital sentencing law); Alvarado v. Hill, 252 F.3d 1066, 1069 (9th Cir. 2001) (same).

Thompson-Bonilla's sentence of 45-to-life for an armed robbery with a gun by a recidivist is not that "rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Ewing, 538 U.S. at 30. His sentence did not violate the Eighth Amendment.

## C.    Miranda Claim

Thompson-Bonilla contends that the trial court should not have allowed into evidence a statement he made to a police officer before he was advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). The facts were these: "The police had not yet given Miranda advisements when [Thompson-Bonilla], handcuffed and being led to a patrol car, remarked: '[T]hat fucking rock got me pulling this shit.' A police officer asked [Thompson-Bonilla] what he meant and [Thompson-Bonilla] said, 'all this robbing shit.'" Cal. Ct. App. Opinion, p. 5.

The California Court of Appeal rejected the Miranda claim:

> [Thompson-Bonilla] concedes that his first statement ("that fucking rock got me pulling this shit") was a spontaneous admission that was not the product of any police interrogation. But [Thompson-Bonilla] maintains that the police officer wrongly questioned [Thompson-Bonilla] to elicit the second, incriminating response ("all this robbing shit"), in asking [Thompson-Bonilla] what he meant by his first remark. As the People point out, an officer's neutral inquiries to clarify a defendant's volunteered statement is not an interrogation under Miranda. (People v. Ray (1996) 13 Cal.4th 313, 338.) Even if we found that the officer's inquiry amounted to interrogation, any error in denying suppression of the second statement was harmless. The first statement is fully incriminating without the second, clarifying statement. Moreover, the challenged statement is insignificant when compared with the overwhelming evidence of guilt in this case, which includes a confession, eyewitness identification, and apprehension of [Thompson-Bonilla] blocks from the scene of a robbery in possession of a gun and the victim's stolen property.

Cal. Ct. App. Opinion, p. 11.

In Miranda, the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. Miranda requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and

10

that he has the right to have counsel appointed.  See Miranda 384 U.S. at 444.  These warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action.  See id. at 444.  General "on-the-scene questioning" concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-finding process do not trigger a duty to give Miranda warnings.  See id. at 477-78.  "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Pope v. Zenon, 69 F.3d 1018, 1023 (9th Cir. 1995), overruled on other grounds, United States v. Orso, 266 F.3d 1030 (9th Cir. 2001) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  Habeas relief may be granted only if the admission of statements obtained in violation of Miranda "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Pope, 69 F.3d at 1020 (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

Assuming arguendo that the police officer's question amounted to interrogation, the admission of the second statement Thompson-Bonilla made was, at most, harmless error.  Like the California Court of Appeal, this court sees the first statement he blurted out as fully incriminating.  That he then clarified it to specify that it was the robberies to which he referred did not make matters much worse for him.  No interrogation preceded Thompson-Bonilla's statement "that fucking rock got me pulling this shit," and that statement would be admissible in evidence with or without the second statement that clarified that "this shit" meant "all this robbing shit."  Any ambiguity about the meaning of the first statement was minimal in light of the circumstances: he made the statement just after he was arrested for a robbery that had taken place moments earlier and, when arrested, he had a gun in a paper bag (like victim Maria Cahill reported the perpetrator pointed at her) and had about the same amount of money Cahill said had just been taken from her.  The gun in a paper bag also matched the report of James Roth, who had just moments earlier had a gun in a paper bag pointed at him in an attempted robbery.  Under

**United States District Court**
For the Northern District of California

1   the circumstances, that first statement did not need the clarifying statement to be extremely

2   damaging to the defense.  In addition to the very incriminating statement Thompson-Bonilla

3   blurted out, there was substantial other evidence against him: the gun in the bag, the possession

4   of a $10 bill and almost $3 in coins coinciding with the amount of money a recent robbery victim

5   had reported was taken from her, the victims' strong identifications of him as the person who had

6   robbed or tried rob them, and his confession at the police station.  It can be said with complete

7   certainty that the admission of evidence that Thompson-Bonilla told the officer that he was

8   referring to robberies did not have a substantial and injurious effect on the decision of the judge

9   who sat as the trier of fact.  The California Court of Appeal's rejection of the <u>Miranda</u> claim as

10   harmless error was not contrary to or an unreasonable application of clearly established federal

11   law as set forth by the Supreme Court.

12

13   D.      <u>Voluntariness Of Confession</u>

14          Thompson-Bonilla contends that his confession at the police station was involuntary

15   because it was induced by false promises of leniency and made while he was under the influence

16   of cocaine.   He claims that the trial court erred in refusing to exclude the confession.  The

17   California Court of Appeal found that he was not promised leniency and the confession was not

18   made under the influence of cocaine.

19          Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

20   Amendment. <u>See</u> <u>Blackburn v. Alabama</u>, 361 U.S. 199, 205-07 (1960).  The voluntariness of

21   a confession is evaluated by reviewing both the police conduct in extracting the statements and

22   the effect of that conduct on the suspect.  <u>See</u> <u>Miller v. Fenton</u>, 474 U.S. 104, 116 (1985).

23   Absent police misconduct causally related to the confession, there is no basis for concluding that

24   a confession was involuntary in violation of the Fourteenth Amendment.  <u>See</u> <u>Colorado v.</u>

25   <u>Connelly</u>, 479 U.S. 157, 167 (1986).  The court must consider the effect that the totality of the

26   circumstances had upon the will of the defendant.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S.

27   218, 227 (1973).  "The test is whether, considering the totality of the circumstances, the

28

United States District Court

For the Northern District of California

government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)).

A statement is involuntary if extracted by any sort of threats or violence, or obtained by any direct or implied promise or by the exertion of any improper influence. See Hutto v. Ross, 429 U.S. 28, 30 (1976). But this does not mean every statement made in response to a promise made by law enforcement personnel is inadmissible; rather, the "promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." Leon Guerrero, 847 F.2d at 1366.; see, e.g., id. (promise to inform the prosecutor about a suspect's cooperation – even if accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect -- does not render subsequent statements involuntary).

### 1.   The Alleged Promise Of Leniency

Thompson-Bonilla does not contend that one will find an explicit promise of leniency in the record, but instead contends that a promise of leniency may be inferred from a statement he made in the recorded part of the interview that indicates that there was a promise of leniency made earlier in the unrecorded part of the interview. The California Court of Appeal disagreed.

> The record contains no evidence that [Thompson-Bonilla] was promised leniency. [Thompson-Bonilla's] interrogation began around 7:00 p.m. on January 14, 2001, the day of his arrest, and audio recordation began at 7:40 p.m. The police officer who interrogated [Thompson-Bonilla] testified that he never told [Thompson-Bonilla] that [Thompson-Bonilla] would receive any type of benefit by talking to the police. The recorded interrogation is devoid of any mention of leniency, as [Thompson-Bonilla] admits. However, [Thompson-Bonilla] claims that he was promised leniency during his initial interrogation, before audio recordation. His claim rests entirely upon one vague statement he made during his recorded confession. The statement was made as the officer was pressing [him] as to whether he committed any additional robberies in the days preceding his arrest. [Thompson-Bonilla] insisted that he had not committed other robberies, and that he was being "straightforward." [Thompson-Bonilla] explained: "You know, I ain't trying to shoot you to the left or trying to put no, no moons on you or anything like that because . . . [¶] . . . [¶] . . . you know, *basically the way I see it the fact of me getting caught up for robberies they're going to sink my ship anyway, the way I feel about it in the system. You think differently. I hope you're right.* Uh, so what I'm saying is that I'm just trying to, let's just, let's cut through the chase and all the bullcrap and give you guys what you need from me based on the way I see it. I mean, I mean how can I deny these things anyway. I got ID'd twice. You know, within a, I don't know, half-hour to forty minutes."

13

United States District Court
For the Northern District of California

1
2
3
4
5

[Thompson-Bonilla] argues that his recorded statement that his arrest for robbery and attempted robbery was "going to sink [his] ship" but that the officer "think[s] differently" implies that a promise of leniency must have been made during the initial interrogation.  No such implication arises.  The interrogating officer explicitly, and emphatically, denied that this statement referred to promised leniency.  The officer testified that he "made it very clear" that he does "not speak for the district attorney.  And I can't speak to sentencing and things like that."  As the trial court found, [Thompson-Bonilla's] vague statement that the police officer "thinks differently" about whether [his] ship would sink may have been no more than a reference to the officer's disavowal of any knowledge of what punishment would be imposed.

6
7

Cal. Ct. App. Opinion, pp. 9-10 (quoting trial exhibit 3A (here, respondent's exhibit 2), p. 10)

8

(italics in source).

9

The state court of appeal's finding that there was no promise of leniency – in the recorded

10

part of the interview or in the unrecorded part of the interview – are findings of fact entitled to

11

a presumption of correctness under 28 U.S.C. § 2254(e).  Thompson-Bonilla's brief – which is

12

a photocopy of his state appellate court brief – comes nowhere near to providing the clear and

13

convincing evidence necessary to rebut that presumption of correctness.[1]  With the starting point

14

of the legal analysis being a determination that there was no promise of leniency, the legal

15

analysis quickly ends.  There being no promise of leniency, it follows that the confession was

16

not involuntary as a result of one.

17
18

2.    Effects Of Cocaine

19

The California Court of Appeal rejected the contention that the confession was the

20

product of Thompson-Bonilla being under the influence of cocaine.  The court explained that

21

a confession by one under the influence of drugs is not involuntary unless "'his reasoning was

22

in fact so impaired that he was incapable of free or rational choice.'"  Cal. Ct. App. Opinion, p.

23

10 (quoting People v. Mayfield, 5 Cal.4th 142, 204 (Cal. 1993)).  This was not such a case.  The

24
25
26
27
28

[1]This court has reviewed the transcript of the taped interview as well as sergeant Figueroa's testimony about the interrogation on these points, see RT 136-162, and sees no error in the state appellate court's description of it – and certainly not anything that would amount to clear and convincing evidence that the state  appellate court's determination was wrong.  The videotape of the interview was not provided to the court, but Thompson-Bonilla made no argument here or in state court that there is something to be seen on the videotape that would show the trial court or state appellate court's evaluation of it to be erroneous.

court explained that at least eight hours had passed since the alleged drug use before the interrogation took place and Thompson-Bonilla "admitted during the interrogation that the drug was 'beginning to wear off' around 1:00 p.m., six hours before he was interrogated.  The interrogating officer testified that [Thompson-Bonilla] was not under the influence of drugs. We have also independently reviewed both the transcript and the audiotape of the interrogation, and neither provides any evidence that [he] suffered any mental impairment at the time of his confession." Id. at 10-11.

The state court of appeal's finding that there was no evidence to support the assertion that Thompson-Bonilla suffered any mental impairment due to cocaine when he confessed is a finding of fact entitled to a presumption of correctness under 28 U.S.C. § 2254(e).  Thompson-Bonilla's brief – which is a photocopy of his state appellate court brief – comes nowhere near to providing the clear and convincing evidence necessary to rebut that presumption of correctness.  With the starting point of the legal analysis being a determination that Thompson-Bonilla's mental processes were not impaired by cocaine at the time he confessed, the legal analysis quickly ends.  There being no impairment stemming from drug use, it follows that the confession cannot be deemed coerced on that ground.

E.     Allegedly Suggestive Identification Procedures

Thompson-Bonilla contends that the procedures used for the victims to identify him were unacceptably suggestive and the subsequent in-court identifications by them violated his right to due process.  Two victims identified him in field show-ups where he was the only person displayed to them; two other victims identified him during police station lineups where he was one of six people displayed.  The relevant facts are these:

> The police drove Cahill to the site of [Thompson-Bonilla]'s detention around 1:20 p.m., only 10 minutes after she was robbed.  A police officer explained to Cahill that the person the police detained and were taking her to see for possible identification "may or may not be" the robber.  Cahill sat in a patrol car 40 feet across the street from where [Thompson-Bonilla] stood facing her, and identified [Thompson-Bonilla] as the robber.
>
> Roth also made an in-field identification of [Thompson-Bonilla].  A police officer told Roth that the police had "picked somebody up" and wanted him to see if he could

make an identification.  The police drove Roth to Mandela and 7th Streets, where [Thompson-Bonilla] was brought out from a waiting patrol car.  Roth arrived at the scene a half hour or less from the time of the attempted robbery.  Roth immediately identified [Thompson-Bonilla] as the robber, and then asked if the man had a cap.  [Thompson-Bonilla]'s cap was placed on his head, and Roth further confirmed his identification of [Thompson-Bonilla] as the robber, saying, "[t]hat's positive," and "everything now fits."

Crocette and Bell were taken to a police station for a physical lineup a couple days later, on January 16, 2001, and identified [Thompson-Bonilla] as the man who robbed them.  Crocette testified that she "had no doubt" that [Thompson-Bonilla], whom she identified from the lineup, was the man who robbed her eight days earlier.  Bell was likewise certain of her lineup identification of [Thompson-Bonilla], made within a week of being robbed.  Bell testified that she was "more than positive," that [Thompson-Bonilla] was the robber, and characterized her lineup identification as "110 percent sure."

Cal. Ct. App. Opinion, p. 5.

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967).  Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive.  "It is the likelihood of misidentification which violates a defendant's right to due process." Neil v. Biggers, 409 U.S. 188, 198 (1972).  Due process protects against the admission of evidence derived from certain suggestive identification procedures.  See id. at 196; cf. Manson v. Brathwaite, 432 U.S. 98, 106 n.9 (1977) (standards are not different for pretrial and in-trial identifications).  Unnecessarily suggestive identification procedures alone do not require exclusion of in-court identification testimony, however; "reliability is the linchpin in determining the admissibility of identification testimony." See id. at 114.  The factors to consider with regard to an alleged misidentification include: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  See id. at 114; Neil, 409 U.S. at 199-200.  "To prevail on a habeas claim, the petitioner must show that the identification procedures used in the case were "'so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir.), cert. denied, 516 U.S. 1017 (1995) (quoting Stovall v. Denno, 388 U.S. at 301-02).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

The California Court of Appeal found that the field identifications by Cahill and Roth were not impermissibly suggestive because the police had not signaled to either of them that the person being viewed was in fact the robber.  Id. at 12.  The court further found that even if the field identifications were unduly suggestive, they were reliable under the totality of the circumstances:

> Cahill and Roth both had ample opportunity to view the robber during daylight confrontations committed at arm's length.  The victims were attentive and able to provide a description of the robber's clothes and physique, which accurately matched [Thompson-Bonilla].  Roth was certain of his in-field identification, and unhesitatingly identified [Thompson-Bonilla] as the robber.  Cahill was also certain, although she based her identification on the distinctive clothes worn by the robber rather than facial features.  The victims made their identifications within 30 minutes of the crimes.

Id. at 13.

This court disagrees that the field show-up procedure was not suggestive but agrees that it was reliable.  Regardless of what the officers said to indicate it was an open question whether the man being displayed to the victims was the robber, Thompson-Bonilla was displayed to both victims in handcuffs and standing next to a patrol car and uniformed officer.  Those circumstances were suggestive – suggesting that he was the one police thought worth arresting and, in turn, suggesting he was the one they thought was the perpetrator.  However, the reliability of the identification by these two witnesses was strong.  As the state court of appeal explained, both victims saw the perpetrator up close and in the middle of the day; both had described his clothes (i.e., green or green and blue jacket and white pants (in January)) and physique in a way that generally matched him; both had stated he held a gun in a paper bag; both were certain in their identifications of him; and both made their identifications within an hour of the crimes.  The two show-ups were done separately, so the identification by one victim did not contaminate the other's identification of him.  Thompson-Bonilla argues that the suggestiveness of the show-ups made them unreliable; however, the Supreme Court has not made reliability and suggestiveness synonymous and requires that they be viewed separately.  See generally Neill 409 U.S. at 198-99.  The admission of evidence that these two witnesses identified Thompson-Bonilla in a field  show-up did not result in a due process violation.

United States District Court
For the Northern District of California

The California Court of Appeal also rejected the challenge to the lineup at which Crocette and Bell identified Thompson-Bonilla as the man who had robbed them.  The lineup (comprised of six African-American males) was not impermissibly suggestive just because two men were smaller and thinner than him and another one was much older than him – the court explained that there was no requirement that the people in the lineup must be nearly identical.  Cal. Ct. App. Opinion, p. 13.  The state appellate court and the trial court viewed a videotape of the lineup and both concluded that there was nothing on the tape that led either to believe it was suggestive.

The videotape of the lineup has not been made available to this court, but that does not preclude this court from deciding the claim.  The portion of Thompson-Bonilla's habeas brief addressing this claim is a photocopy of his state court appellate brief.  In both he argued that the lineup was suggestive because "of the five African-American fillers eventually chosen, two were smaller and thinner than him, and one was a lot older.  (RT 228.)  Thus, only two of the individuals in the lineup fit his general description."  Second Amended Petition, p. 39.[2]  The California Court of Appeal stated that it had examined the videotape and saw "no support" for Thompson-Bonilla's contention that it was impermissibly suggestive.  Thompson-Bonilla's presentation of the exact same argument to this court is not enough to meet the requirement that he show that the state court's decision was based on an unreasonable determination of the facts in light of te evidence presented in the State court proceeding.  See 28 U.S.C. § 2254(d)(2).

The California Court of Appeal's decision that the lineup was not impermissibly suggestive was not contrary to or an unreasonable application of clearly established federal law.  The lineup took place within two weeks of the robberies, at a time when the crimes were fresh in the victims' memories.  The six people in the lineup were all African American men.  Thompson-Bonilla's argument that a couple of fillers were shorter and one filler was older than

---

[2]Thompson-Bonilla also states in his brief that he "he is African-American, yet not everyone in his pool of choices was of the same ethnicity."  Second Amended Petition, p. 36.  The pool from which the fillers for the lineup were chosen has no bearing on his federal constitutional claim.  The suggestive identification claim is analyzed with reference to the people who were actually viewed by the witnesses and not with reference to people who were not viewed.

United States District Court
For the Northern District of California

him does not show that he was presented so differently from the others in the lineup as to make the lineup unduly suggestive.  See United States v. Burdeau, 168 F.3d 352, 357-58 (9th Cir.), cert. denied, 528 U.S. 958 (1999) (differences in photos of perpetrator and fillers in a photo array "in no way implied that the witnesses should identify him as the perpetrator").  Due process does not require that the participants be identical or identically groomed for the lineup to be acceptable.  The age and stature differences did not create an impermissible suggestion that Thompson-Bonilla was the offender.  Thompson-Bonilla does not show that the identifications made at the non-suggestive lineup were unreliable.  The record suggests no reliability problem, as both of these victims had seen the robber up-close (although at night-time) and had a good opportunity to view him; both made their identifications within eight days of the crimes; and both were extremely certain when they picked him out at the lineup.

Thompson-Bonilla also challenges the later identifications by these victims in court during the trial, claiming that they were tainted by the unreliable pre-trial identifications.  This claim fails because the pretrial identifications were not unreliable.  He is not entitled to the writ on his due process claim.

Finally, he argues that his right to effective assistance of counsel was denied at the lineup.  This Sixth Amendment claim is a non-starter because he had no right to counsel at the lineup.  Counsel is not required at pre-indictment lineups because the right to counsel does not attach until adversary judicial proceedings have been initiated against a defendant.  See Kirby v. Illinois, 406 U.S. 682, 688-91 (1972).

F.    Selective Prosecution/Sentencing Under Three Strikes Law

Thompson-Bonilla urges that his right to equal protection was violated because he and other African-Americans have been singled out for punishment under the harsher sentencing scheme of California's Three Strikes law.  See Petition, pp. 43-44.  He contends that, in an effort to convince the Legislature and electorate that the Three Strikes law was a successful response to criminal recidivism, district attorneys statewide, including in Alameda County, singled out

**United States District Court**
For the Northern District of California

African-Americans and other minority defendants for sentence enhancements while their White criminal counterparts were offered plea bargains or had the prior convictions stricken.  Id. at 44. He urges that the pattern of discrimination can be determined if "one closely examines the statistical data," id. at 45, but did not provide that data.  He asks to do discovery to demonstrate the disparate treatment.  Id. at 48.

A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution.  See United States v. Armstrong, 517 U.S. 456, 463 (1996).  Although the decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion, this discretion is subject to constitutional constraints, such as that it may not violate equal protection by relying on race.  See id. at 464.  In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "'clear evidence to the contrary.'"  Id. (citation omitted).  Unsupported allegations of selective prosecution are not enough.  See United States v. Davis, 36 F.3d 1424, 1433 (9th Cir. 1994), cert. denied, 513 U.S. 1171 (1995); see also United States v. Buffington, 815 F.2d 1292, 1305 (9th Cir. 1987) (speculation of selectivity by black defendant previously acquitted of officer's murder, without additional proof, insufficient to establish selective prosecution).

To establish a prima facie case of selective prosecution, the claimant must show that the prosecutorial policy (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose.  See Armstrong, 517 U.S. at 465.  "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  Id.

Thompson-Bonilla comes nowhere near to showing a prima facie case of selective prosecution.  His assertion that an analysis of unidentified data will show the selectivity of enforcement of the Three Strikes law is insufficient, as it was up to him to make that showing rather than just guess that such a showing could be made if one looked at the unidentified data. Likewise, his argument about various unidentified national and regional studies does not make

a prima facie case of selective prosecution.  He has not shown that similarly situated individuals (e.g., robbers with multiple current offenses) were not prosecuted under the Three Strikes law.

The Alameda County Superior Court rejected this claim because Thompson-Bonilla "fail[ed] to offer any factual or substantive support for his claim that the application of the Three Strikes Law violated his rights to Due Process or Equal Protection."  Second Amended Petition, unnumbered exhibit.  That determination was not contrary to or an unreasonable application of Armstrong; the dearth of evidentiary support for his generic allegation that a group has been treated differently dooms the claim to failure.  The claim is denied.[3]

G.      Claim For Breach of Plea Agreement From Prior Conviction

Thompson urges that the use of his old convictions for sentencing under the Three Strikes law violated his right to due process and equal protection and "breached the terms and spirit of their contractual agreement."  Second Amended Petition, p. 51.  He contends that there was "no specific reference concerning future usage of the proceedings or plea for purposes of enhancing a subsequent conviction and sentence beyond that specifically mentioned" in the then-existing laws when he pled guilty.  Petitioner, pp. 52-53.

The use of the old convictions did not violate any federal constitutional right Thompson-Bonilla possessed.  Due process concerns of fundamental fairness require that a prosecutor keep the promises upon which a defendant relies in entering into a plea agreement.  See Santobello v. New York, 404 U.S. 257, 262 (1971); Johnson v. Lumpkin, 769 F.2d 630, 633 (9th Cir. 1985).  Claims of a breached plea agreement are analyzed according to contract law standards of

---

[3]The justifications for a rigorous standard for the elements of a selective-prosecution claim require a correspondingly rigorous standard for discovery in aid of such a claim.  See Armstrong, 517 U.S. at 468.  To establish entitlement to do discovery the petitioner must present "a credible showing of different treatment of similarly situated persons," i.e., persons that could have been prosecuted but were not.  Id. at 469-70.  Thompson-Bonilla has not shown his entitlement to discovery to try to learn of statistical information that might support his theory.  His petition is simply too short on details to meet the rigorous standard identified by Armstrong for relief or even to permit discovery.

United States District Court
For the Northern District of California

interpretation, such that a court looks to what was reasonably understood by the parties to be the terms of the agreement and whether or not those terms were fulfilled.  See United States v. Kramer, 781 F.2d 1380, 1387 (9th Cir.), cert. denied, 479 U.S. 819 (1986).  California contracts, including plea bargains, are "'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws.'"  People v. Gipson, 117 Cal. App. 4th 1065, 1070 (Cal. Ct. App. 2004) (citation omitted).  Thompson-Bonilla's arguments that rely on the contractual nature of the old plea agreements fail because he concedes that the possibility of future use of the convictions was not part of the plea agreements.  Because of the absence of any agreement that the convictions could not be used, there is no contract term to enforce.  The fact that the trial courts that accepted his guilty pleas in the earlier proceedings did not warn him of the possibility of future enhancements under a law that did not yet exist did not violate his constitutional rights.  See United States v. Brownlie, 915 F.2d 527, 528 (9th Cir. 1990) (defendant need not be informed of the possibility of a future sentence enhancement). There is no merit to Thompson-Bonilla's claim that the use of the old convictions violated any federal constitutional right he possessed.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 30, 2008

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California